CHICAGO AREA COUNCIL OF BOY SCOUTS OF AMERICA, Petitioner-Appellant, v. THE CITY OF CHICAGO COMMISSION ON HUMAN RELATIONS *et al.*, Respondents-Appellees.

First District (2nd Division)   No. 1—99—3018

Opinion filed May 1, 2001.

18

John A. Ybarra, of Littler, Mendelsohn, P.C., of Chicago, and George A.

Davidson and Carla A. Kerr, both of Hughes, Hubbard & Reed, L.L.P., of New York, New York, for appellant.

Mara S. Georges, Corporation Counsel, of Chicago (Lawrence Rosenthal, Benna Ruth Solomon, and Suzanne M. Loose, Assistant Corporation Counsel, of counsel), Charles H.R. Peters and William M. Aguiar, both of Schiff, Hardin & Waite, and Harvey A. Grossman, Lauren B. Raphael, and Pamela L. Sumners, all of Roger Baldwin Foundation of ACLU, Inc., both of Chicago, for appellees.

JUSTICE COUSINS delivered the opinion of the court:

G. Keith Richardson filed a claim with the City of Chicago Commission on Human Relations (Commission) against defendant Chicago Area Council of Boy Scouts of America (CAC) under the Chicago Human Rights Ordinance (the Ordinance) (Chicago Municipal Code § 2—160—010 *et seq.* (1990)). Specifically, Richardson invoked section 2—160—030, alleging employment discrimination in hiring based on sexual orientation. Chicago Municipal Code § 2—160—030 (1990). The Commission issued an injunction against CAC and imposed a $100 fine. The injunction enjoined CAC from considering the sexual orientation of applicants for employment. Richardson was also awarded $500 in damages and attorney fees and costs in the amount of $335,748.12.

CAC filed a writ of *certiorari* in the circuit court of Cook County. The court held that Richardson lacked standing to bring suit based on the Commission's finding that Richardson was not genuinely interested in accepting a position with CAC. Accordingly, the court vacated the Commission's award of damages and attorney fees. However, the court affirmed the injunction and fine by holding that the City of Chicago, independent of Richardson, prevailed in the action and that the Commission had authority to enjoin discriminatory action even though it had not formally initiated a complaint against CAC.

On appeal, CAC argues that the injunction and fine should be vacated because: (1) application of section 2—160—030 violates CAC's first amendment rights of expressive association (U.S. Const., amend. I); (2) Richardson lacked standing to sue for employment discrimination; and (3) CAC's employment policy was exempt from the Ordinance under its express exceptions for religious organizations or *bona fide* occupational qualification. Richardson cross-appeals the trial court's ruling that he lacked standing as an employment tester.

## BACKGROUND

Richardson filed an employment discrimination complaint with the Commission on May 21, 1992, alleging that CAC discriminated against him based on his sexual orientation. The Commission held an

extensive hearing. The record reveals the following. The CAC is chartered by the Boy Scouts of America (Boy Scouts) and agrees to comply with the rules and regulations of the Boy Scouts. The Boy Scouts, in turn, are chartered by Congress:

"[T]o promote, through organization and cooperation with other agencies, the ability of boys to do things for themselves and others, to train them in Scoutcraft, to teach them patriotism, courage, self-reliance, and kindred virtues, using the methods which are now in common use by Boy Scouts."

According to its mission statement:

"It is the mission of the Boy Scouts of America to serve others by helping to instill values in young people and, in other ways, to prepare them to make ethical choices over their lifetime in achieving their full potential. The values we strive to instill are based on those found in the Scout Oath and Law:

Scout Oath

On my honor I will do my best To do my duty to God and my country and to obey the Scout Law; To help other people at all times; To keep myself physically strong, mentally awake, and morally straight.

Scout Law

A Scout is:

| | |
|---|---|
| Trustworthy | Obedient |
| Loyal | Cheerful |
| Helpful | Thrifty |
| Friendly | Brave |
| Courteous | Clean |
| Kind | Reverent." |

Adult professional and volunteer leaders, as well as youth members, are required to take the Scout oath and follow Scout law.

As a youth, Richardson participated in Boy Scouts and achieved the highest rank of Eagle Scout. He became involved in various Scout leadership roles and attained honors. In his early 20s, Richardson acknowledged that he was gay and left Scouting. After college, he worked in restaurants or bars catering to the gay community that featured sexually explicit videos and live sex shows.

Finding himself unemployed in the spring of 1992, Richardson came across an advertisement that sought contact from persons who had been Scouts and were gay. Richardson responded to the advertisement and spoke to a founder of the "Forgotten Scouts"—a group that seeks to change the Boy Scouts' policy barring employment of homosexuals. A month before Richardson contacted CAC, he attended a meeting with a cofounder of Forgotten Scouts to persuade United

Way to stop funding CAC unless CAC changed its policies concerning homosexuality.

On May 1992, Richardson called CAC and asked to speak with CAC's public relations person. He spoke to Susan Teplinsky. He was told by the receptionist that Susan Teplinsky was CAC's spokesperson. Teplinsky prepared a memorandum, dated May 22, 1992, that summarized the conversation. Richardson testified that he did not disagree with the contents of the memorandum. The memorandum stated:

"I received a call this morning from Keith Richardson, leader of the local Forgotten Scouts. Much of our 15 minute conversation focused on whether or not the Chicago Area Council would break with national policy and endorse the inclusion of homosexuals in Scouting. I told him there was no way the CAC would ever break with national policy, based on current corporate culture and informal discussions with our board of directors.

Our discussion was amicable and open. He asked if there was any value in our getting together, and I said I would be happy to request permission to meet with him, but added that I thought the outcome would have no bearing on our decision. In the interest of not wasting each other's time, we agreed not to meet.

* * *

Keith explained that in light of the Randall decision in California, the group will try to work new legal maneuvers. To begin, he is on his way to the human rights commission to file a grievance against us for not employing homosexuals."

Regarding the conversation, Richardson testified as follows:

"A. [Richardson:] And then I asked her about employment.

Q. Why don't you describe that aspect of the conversation, tell the Hearing Officer.

A. I didn't know—no one from the Boy Scouts had ever told me officially they had a policy—existed in terms of employment one way or the other. So I asked her if there was a policy, would they give a job to a gay man, and her answer was there was no way the Boy Scouts of America was going to give a job to a homosexual."

Richardson then filed a complaint with the Commission on May 21, 1992, alleging violation of section 2—160—030. Section 2—160—030 states in pertinent part:

"No person shall directly or indirectly discriminate against any individual in hiring *** because of the individual's *** sexual orientation ***." Chicago Municipal Code § 2—160—030 (1990).

In July 1992, Richardson appeared on a talk show and was identified as regional spokesperson for Forgotten Scouts.

On July 27, 1992, Richardson sent a letter to CAC indicating that he was gay and that he "remaine[d] very interested in any job opening

with the [CAC]." He also attached a resume that stated the following under the heading "OBJECTIVE":

"To obtain a position with a non-profit organization where my abilities in the areas of organization, management, *public relations* and *volunteer recruitment* would be fully utilized." (Emphasis added.)

While the resume listed his Scouting experience, it omitted information relating to his prior work experience except to say that he generally worked in the "Food & Beverage" industry and was self-employed and oversaw the opening of a new business. The Commission characterized the letter as "an apparent attempt to cure a possible standing problem" after CAC had already moved to dismiss Richardson's complaint.

On September 9, 1992, CAC's acting director of field service, Mark Frankart, responded with a letter and a copy of the Boy Scout's employment policy. The enclosed policy stated:

"Boy Scouts of America's mission is to prepare its youth members to make ethical choices over their lifetime consistent with the traditional family values expressed in the Scout Oath and Scout Law.

Boy Scouts of America believes that homosexual conduct is inconsistent with the requirement in the Scout Oath and Scout Law that a Scout be 'clean' and 'morally straight'.

In the exercise of its constitutional right to bring the values of Scouting to its youth members, Boy Scouts of America will not employ known or avowed homosexuals as professional Scouters or in other capacities in which such employment would tend to interfere with its mission of reinforcing the values of the Scout Oath and Scout Law in young people."

Frankart's letter stated that if Richardson was genuinely interested in applying for a position with CAC, he must supply a complete resume which included his employment history. Richardson never sent the requested information. The Commission found that Richardson was not genuinely interested in seeking a position with CAC and was merely posing as a "tester" to challenge the Boy Scouts' hiring policy.

The parties introduced evidence on the meaning of the words "morally straight" and "clean" as those terms are used in the Scout oath and law. CAC's witnesses equated the words with heterosexuality, whereas Richardson's witnesses did not believe the words referred to sexual orientation in any way. The Commission determined that "the words of the Scout Oath and Scout Law take on different meanings for different people."

At the time of the Commission's decision, the Boy Scouts' employment policy concerning homosexuals stated:

"With respect to positions limited to professional Scouters or, because of their close relationship to the mission of Scouting, positions limited to registered members of the [Boy Scouts of America], acceptance of the Declaration of Religious Principle, the Scout Oath and the Scout Law is required.

Accordingly, in the exercise of their constitutional right to bring the values of Scouting to youth members, the Boy Scouts of America will not employ atheists, agnostics, known or avowed homosexuals, or other as professional Scouters or in other capacities in which such employment would tend to interfere with its mission of reinforcing the values of the Scout Oath and the Scout Law in young people."

Evidence was introduced about professional Scouting employment positions. CAC hires about 35 professional "Scouters" to assist volunteer leaders. The entry level professional Scouter, known as the district executive, works with volunteer leaders. The district executive also recruits, trains, and motivates volunteers while participating in Scouting functions. Scouting professionals adhere to the same Scouting law and oath as adult volunteers and wear a Scout leader's uniform to Scouting functions.

The Boy Scouts' director of personnel, William McLaughlin, described the application process for an entry level professional Scouter. After a local Scout executive reviews an applicant's resume and conducts a screening interview, the local council forwards the applications of viable candidates to the Boy Scouts' regional office. If the applicant is acceptable, he is then eligible for possible employment with the local council, subject to a probationary period.

McLaughlin did not describe the application process for nonprofessional personnel, however. In fact, the parties introduced very little evidence relating to nonprofessional positions. Mark Frankart, the director of field service at CAC, testified that CAC's policy against hiring homosexuals would not apply to "support personnel in the council office," such as accountants, computer support personnel, mail room workers and clerks who do not deal with the public. He also testified that he was only involved in the hiring of professional personnel.

The Commission issued its final order concerning liability and damages on February 26, 1996. The Commission found that CAC's employment policy violated the Ordinance and ordered the following injunctive relief:

"A. That the Respondent be enjoined from considering the sexual orientation of applicants for employment with the CAC; and

B. That the Respondent be enjoined from publishing on its application, brochures or literature, which are distributed within the City of Chicago, any employment criteria which indicates a preference or limitation on the basis of sexual orientation."

The Commission rejected CAC's argument that application of section 2—160—030 violated its first amendment rights of expressive association and speech, finding that opposition to homosexuality was not a significant, expressive goal of CAC. CAC was also fined $100 for violating section 2—160—030. Since the Commission found that Richardson was acting as an employment tester, it awarded only nominal damages of $500 for emotional injury. In a subsequent order, the Commission also awarded Richardson attorney fees and costs totalling $335,748.12.

CAC filed petition for writ of *certiorari* with the circuit court. On August 12, 1999, the court found that Richardson lacked standing as an employment tester under section 2—160—030 and on that basis vacated the Commission's award of attorney fees, costs and damages to Richardson. The court also held that, notwithstanding Richardson's lack of standing and the fact that the Commission never initiated a complaint against CAC, the City of Chicago, independent of Richardson, prevailed in the action and the Commission had power to enjoin CAC's employment policy. The court then affirmed the Commission's injunction against CAC as well as the $100 fine.

CAC appeals and Richardson cross-appeals. We vacate the Commission's entire order, reverse the judgment of the trial court, and remand with directions.

## ANALYSIS

### I

All parties agree that the Commission's injunction is overly broad in light of the United States Supreme Court's recent decision in *Boy Scouts of America v. Dale*, 530 U.S. 640, 147 L. Ed. 2d 554, 120 S. Ct. 2446 (2000). CAC argues that *Dale* precludes the grant of any injunctive relief in this case while Richardson and City of Chicago Commission on Human Relations contend that the Commission's injunction should be modified to conform with *Dale*.

The facts in *Dale* are similar, although not analogous, to the facts in the instant case. *Dale* involved a volunteer assistant scoutmaster, James Dale, whose membership in the Boy Scouts was revoked because he was homosexual. Dale filed a complaint under New Jersey's public accommodations statute, which prohibits discrimination on the basis of sexual orientation in places of public accommodation.

■ The case reached the United States Supreme Court, which held that application of the New Jersey law violated the Boy Scouts' first amendment rights. The Court initially recognized the importance of the right to expressive association under the first amendment. According to the Court:

"This right is crucial in preventing the majority from imposing its

views on groups that would rather express other, perhaps unpopular, ideas. ***

The forced inclusion of an unwanted person in a group infringes the group's freedom of expressive association if the presence of that person affects in a significant way the group's ability to advocate public or private viewpoints." *Dale*, 530 U.S. at 647-48, 147 L. Ed. 2d at 562-63, 120 S. Ct. at 2451.

Since this first amendment case involved ultimate conclusions of law that were inseparable from findings of fact, the Court independently reviewed the factual record to guarantee that the lower court's judgment did not unlawfully intrude on free expression. *Dale*, 530 U.S. at 648-49, 147 L. Ed. 2d at 563, 120 S. Ct. at 2451.

The Court then conducted a four-part analysis to determine whether the forced inclusion of Dale violated the Boy Scouts' first amendment rights. First, the Court determined that the Boy Scouts engaged in "expressive association," meaning that the group engaged in some form of expression, public or private. *Dale*, 530 U.S. at 648, 147 L. Ed. 2d at 563, 120 S. Ct. at 2451. Quoting the Boy Scouts' mission statement, Scout oath and Scout law, the Court concluded that an association whose mission is to instill values in young people indisputably engages in expressive activity.

Second, the Court examined the nature of the Boy Scouts' views on homosexuality. The Court noted that the terms "morally straight" and "clean" contained in the Scout oath and law were not self-defining. "Different people would attribute to those terms very different meanings." *Dale*, 530 U.S. at 650, 147 L. Ed. 2d at 564, 120 S. Ct. at 2452. However, the Court accepted the Boy Scouts' assertion that it did not want to promote homosexual conduct as a "morally straight" and legitimate form of behavior. The Court also considered written evidence that supported the sincerity of the Boy Scouts' professed beliefs. A 1978 position statement indicated that homosexuality and leadership in Scouting were inappropriate. Similarly, a 1991 position statement expressed that homosexual conduct was inconsistent with being "morally straight" and "clean," and a 1993 statement declared that homosexuals did not provide a desirable role model for Scouts.

Third, the Court found that Dale's presence as an assistant scoutmaster would significantly burden the Boy Scouts' desire not to promote homosexuality as a legitimate form of behavior. The Court noted that Dale was open and honest about his sexual orientation and was part of a group of gay Scouts who were leaders in their community. He was also copresident of a gay and lesbian organization and remains a gay rights activist. "Dale's presence in the Boy Scouts would, at the very least, force the organization to send a message,

both to the youth members and the world, that the Boy Scouts accepts homosexual conduct as a legitimate form of behavior." *Dale,* 530 U.S. at 653, 147 L. Ed. 2d at 566, 120 S. Ct. at 2454.

The Court relied on its decision in *Hurley v. Irish-American Gay, Lesbian & Bisexual Group of Boston, Inc.,* 515 U.S. 557, 132 L. Ed. 2d 487, 115 S. Ct. 2338 (1995), to further illustrate this point. In *Hurley* the Court held that the application of Massachusetts' public accommodations law to require the organizers of a private St. Patrick's Day parade to include an Irish-American gay, lesbian, and bisexual group (GLIB) violated the parade organizers' first amendment rights. In *Hurley* the Court wrote:

> "Petitioners disclaim any intent to exclude homosexuals as such, and no individual member of GLIB claims to have been excluded from parading as a member of any group that the Council has approved to march. Instead, the disagreement goes to the admission of GLIB as its own parade unit carrying its own banner." *Hurley,* 515 U.S. at 572, 132 L. Ed. 2d at 503, 115 S. Ct. at 2347.

The Court reasoned that the presence of the organized marchers behind a GLIB banner would suggest their view that people of their sexual orientation have as much claim to unqualified social acceptance as heterosexuals. The Court explained that the forced presence of GLIB in the parade violated the parade organizers' autonomy to choose the content of their own message under the first amendment. *Hurley,* 515 U.S. at 573-75, 132 L. Ed. 2d at 503-04, 115 S. Ct. at 2347-48. Relying on *Hurley,* the Court in *Dale* found that Dale's presence would just as surely interfere with the Boy Scouts' choice not to propound a point of view contrary to its belief. *Dale,* 530 U.S. at 654, 147 L. Ed. 2d at 566, 120 S. Ct. at 2454.

Finally, the Court weighed the state's interest in eliminating discrimination within public accommodations against the Boy Scouts' associational interest in freedom of expression. Emphasizing Dale's presence as a significant burden on the Boy Scouts' right to oppose homosexual conduct, the Court concluded that the state's interests did not "justify such a severe intrusion on the Boy Scouts' rights to freedom of expressive association." *Dale,* 530 U.S. at 659, 147 L. Ed. 2d at 569, 120 S. Ct. at 2457. The Court further indicated that increasing social acceptance of homosexuality was no argument for denying first amendment protection to those who refuse to accept these views:

> "[P]ublic or judicial disapproval of a tenet of an organization's expression does not justify the State's effort to compel the organization to accept members where such acceptance would derogate from the organization's expressive message." *Dale,* 530 U.S. at 661, 147 L. Ed. 2d at 570-71, 120 S. Ct. at 2458.

The record in the instant case includes the same mission statement, Scout oath and Scout law relied upon by the Court in *Dale* to conclude that the organization engaged in expressive activity by seeking to inculcate values in youth. While the Supreme Court deferred to the Boy Scouts' assertion that homosexuality was inconsistent with the values embodied in the Scout oath and law, the Court also referred to the 1978, 1991 and 1993 position statements which bolstered the sincerity of the group's professed belief that homosexuality was inconsistent with scouting. Similarly, CAC here cites 1991 position statements that support its view that an avowed homosexual cannot be a Scout leader.

Like the complainant in *Dale*, Richardson was open and honest about his sexual orientation when he contacted CAC for a job. The Commission determined that Richardson was a "tester," an individual who was not genuinely interested in accepting a job with CAC, but simply posed as an applicant in order to gather evidence of discriminatory hiring practices. The Commission also found that Richardson publicly identified himself as a regional spokesperson for Forgotten Scouts, a group whose purpose is to demonstrate that the Boy Scouts' policy barring employment of homosexuals is "wrong *** and should be changed." Richardson's presence in an expressive position as a role model or leader within Scouting would similarly compel CAC to broadcast to youth members and the world that homosexual conduct was a legitimate form of behavior. The city's interest in eradicating employment discrimination would not justify such a severe intrusion on the Boy Scouts' rights to freedom of expressive association.

Like the New Jersey Supreme Court in *Dale*, the trial court and Commission here found that CAC's ability to disseminate its message was not significantly affected by the forced inclusion of Richardson because: (1) opposition to homosexuality was not a central, expressive goal of the CAC; and (2) CAC discouraged its leaders from disseminating *any* views on sexual issues. *Dale* disagreed with the conclusion drawn from such findings. *Dale*, 530 U.S. at 654-55, 147 L. Ed. 2d at 567, 120 S. Ct. at 2454-55.

On appeal, Richardson also argues that *Dale* is distinguishable because Dale occupied an influential position as assistant scoutmaster; whereas, Richardson claims that he was applying for *any* job. Richardson further posits that his presence in a non-message-carrying position would not significantly burden CAC's expression and that a more narrowly tailored injunction would not abridge the constitutional concerns expressed in *Dale*.

■ If an injunction restrains the exercise of first amendment rights, it must be couched in terms that will accomplish constitution-

ally permitted objectives. *Paschen Contractors, Inc. v. Burrell*, 14 Ill. App. 3d 748, 752, 303 N.E.2d 246 (1973). The state may not broadly stifle fundamental personal liberties when the end can be more narrowly achieved. *Paschen*, 14 Ill. App. 3d at 752. Furthermore, an injunction's wording must conform to standards of specificity: the order must be complete in the details of its prohibition and the court's intent must be clearly and easily discernible. *Paschen*, 14 Ill. App. 3d at 752.

In the instant case, CAC contends in its brief that its employment policy only applies to "role-model" or communicative positions. At the hearing, Mark Frankart testified that the policy did not apply to "support personnel in the council office, people who would perform functions \*\*\* such as accounting or computer support personnel, possibly mail room or clerical functions where they would be employees, but really in no way related to deal with [CAC's] public."

We note that the Commission wrote in its final ruling on liability and damages that "the Complainant, a gay man, claims to have been denied employment as a Professional Scouter as a result of his sexual orientation." However, the Commission's findings were entered prior to the United States Supreme Court's decision in *Dale* and the Commission has made no specific factual finding as to whether Richardson was seeking a nonexpressive position that does not abridge the *Dale* decision. Also, the Commission has not made specific factual findings as to whether CAC "directly or indirectly discriminate[s] against any individual in hiring \*\*\* because of the individual's \*\*\* sexual orientation" regarding nonexpressive positions. Chicago Municipal Code § 2—160—030 (1990). The Court in *Dale*, while holding that Dale's presence as an assistant scoutmaster would significantly impair the Scout's first amendment right of expressive association, also wrote:

"That is not to say than an expressive association can erect a shield against antidiscrimination laws simply by asserting that mere acceptance of a member from a particular group would impair its message." *Dale*, 530 U.S. at 653, 147 L. Ed. 2d at 566, 120 S. Ct. at 2453-54.

■ On the one hand, because the findings made by the Commission that CAC discriminated against a person seeking employment based on sexual orientation makes no distinction between CAC's expressive and nonexpressive positions, we cannot say that *Dale* precludes the issuance of injunctive relief. However, on the other hand, without factual findings on the issue of whether CAC's policies discriminated against Richardson based on his sexual orientation regarding nonexpressive positions that do not abridge *Dale*, we cannot direct that a narrowly tailored injunction issue.

Accordingly, we remand this cause to the Commission for further factual findings. In making further factual findings, the Commission may have additional evidence taken. Relative thereto, the Commission should designate a representative list of nonexpressive positions within CAC where the presence of a homosexual would not "derogate from [CAC's] expressive message." *Dale*, 530 U.S. at 661, 147 L. Ed. 2d at 570-71, 120 S. Ct. at 2458. The Commission should also make a factual finding as to whether Richardson was seeking a nonexpressive position with CAC. A narrowly tailored injunction may issue if the Commission determines that: (1) Richardson was either seeking a nonexpressive position or was testing CAC's hiring practices relating to nonexpressive positions; and (2) CAC discriminated against Richardson regarding nonexpressive positions because of his sexual orientation.

## II

In his cross-appeal, Richardson relies on the Seventh Circuit's decision in *Kyles v. J.K. Guardian Security Services, Inc.*, 222 F.3d 289 (7th Cir. 2000), and contends that employment testers who experience discrimination when they apply for jobs have standing to sue under section 2—160—030. *Kyles* supports Richardson's contention.

In *Kyles*, two African-American women worked as employment testers[1] for the Legal Assistance Foundation of Chicago. As a condition of their employment, the testers agreed to refuse any job offer extended to them. The testers both applied for a receptionist position and were paired with a white counterpart whose credentials were comparable or inferior to those of the testers. Although each of their white counterparts was offered the job, neither of the testers got past the initial interview. The testers sued defendant employer for race discrimination under Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e (1994)), as well as section 1 of the Civil Rights Act of 1866 (42 U.S.C. § 1981 (1994)). Since the testers were not genuinely interested in working for defendant and would not have accepted employment had it been offered, the district court found that the testers did not suffer the type of personal, redressable injury that would satisfy the "case or controversy" requirement of article III of the United States Constitution (U.S. Const., art. III, § 2). *Kyles*, 222 F.3d at 292-93.

---

[1]"In the employment context, a 'tester' is an individual who, without intent to accept an offer of employment, poses as a job applicant in order to gather evidence of discriminatory hiring practices." *Kyles*, 222 F.3d at 291 n.1, citing *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 370, 373-74, 71 L. Ed. 2d 214, 223, 225-26, 102 S. Ct. 1114, 1119, 1121 (1982).

The Seventh Circuit Court of Appeals reversed and held that the testers had standing to sue for violations of Title VII. The court indicated that in order to establish standing under article III, a plaintiff must show that: (1) she has suffered an "injury in fact" (concrete and particularized; not conjectural or hypothetical); (2) the injury is fairly traceable to defendant's challenged action; and (3) it is likely that the injury will be redressed by a favorable decision. *Kyles*, 222 F.3d at 294.

*Kyles* first examined the statutory language of Title VII to determine whether employment testers suffered an "injury in fact." Title VII provided in pertinent part:

"It shall be an unlawful employment practice for an employer—

(1) to fail or refuse to hire *** any individual *** because of such individual's race ***; or

(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities *** because of such individual's race ***." 42 U.S.C. § 2000e—2(a) (1994).

Guided by the Supreme Court's analysis in *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 71 L. Ed. 2d 214, 102 S. Ct. 1114 (1982) (testers had standing to bring suit for violations of the Fair Housing Act (42 U.S.C. § 3604(d) (1994)), *Kyles* focused on similarities between the Fair Housing Act and Title VII. *Kyles* indicated that the following similarities signaled legislative intent to extend standing to the fullest extent permitted by article III:

(1) both statutes took broad aim at discrimination;

(2) they authorized individuals to bring suit for statutory violations and, in effect, act as "private attorney generals"; and

(3) they permitted "any individual" aggrieved by a violation to file a charge and suit.

*Kyles*, 222 F.3d at 297-98. *Kyles* concluded that the employment testers had standing to sue under Title VII, even if they had not been harmed apart from the statutory violation, because the testers suffered an injury in precisely the form the statute was intended to guard against.

Section 2—160—030 in the instant case is functionally equivalent to Title VII. First, like Title VII, section 2—160—030 takes a broad aim at discriminatory employment practices. The broad purpose of the Ordinance is to "assure that all persons within its jurisdiction *** shall be protected in the enjoyment of civil rights." Chicago Municipal Code § 2—160—010 (1990). Second, like Title VII, section 2—160—030 allows individuals to file claims for violations and thereby act as "private attorney generals." Chicago Municipal Code § 2—160—030

(1990). Finally, the language of the Ordinance parallels Title VII by permitting "any individual" aggrieved by a violation to file a charge of discrimination. Chicago Municipal Code § 2—160—030 (1990). Thus, section 2—160—030 creates a legal right, the denial of which would, in and of itself, give rise to the type of injury necessary to establish standing in the instant case. See also *Molovinsky v. Fair Employment Council of Greater Washington, Inc.*, 683 A.2d 142 (D.C. 1996) (testers had standing to bring action under local ordinance prohibiting sex discrimination in employment); *Lea v. Cone Mills Corp.*, 438 F.2d 86 (4th Cir. 1971) (African-American women had standing to sue under Title VII when employer told them it did not hire "negro females" even though there were no job openings at the time and plaintiffs were not actually seeking employment).

■ In the instant case, we reject the trial court's ruling that the Commission had authority to issue an injunction without formally initiating a complaint of its own. If Richardson lacks standing, the injunction cannot issue. *Moran Transportation Corp. v. Stroger*, 303 Ill. App. 3d 459, 469, 708 N.E.2d 508 (1999) ("In order to be granted an injunction, a plaintiff must have standing in the cause, which requires a showing of a clearly ascertainable right or interest that needs protection"); *Glisson v. City of Marion*, 188 Ill. 2d 211, 221, 720 N.E.2d 1034 (1999) ("The doctrine of standing is designed to preclude persons who have no interest in a controversy from bringing suit").

In its order, the trial court found that "[t]he City of Chicago, independent of the claims of Richardson, has prevailed in this action." However, the City of Chicago is not a party. It is the Commission that the Ordinance vests with specified authority. The Ordinance grants the Commission power to "initiate, receive and investigate complaints of alleged violations of Chapters 2—160 and 5—8 of the Municipal Code." Chicago Municipal Code § 2—120—510(e) (1998). However, nothing in the Municipal Code indicates that the Commission can determine liability and order relief without the filing of a complaint, either by a party with standing or by the Commission itself. The cases that the trial court relied upon are inapposite because they simply relate to a governing authority's power to enact legislation: (1) that is reasonably necessary to execute a grant of power (*People ex rel. Foreman v. Sojourners Motorcycle Club, Ltd.*, 134 Ill. App. 3d 448, 480 N.E.2d 840 (1985)); or (2) that bears a reasonable relationship to the general welfare of the community (*Village of Carpentersville v. Fiala*, 98 Ill. App. 3d 1005, 425 N.E.2d 33 (1981); *Sherman-Reynolds, Inc. v. Mahin*, 47 Ill. 2d 323, 265 N.E.2d 640 (1970); *Petterson v. City of Naperville*, 9 Ill. 2d 233, 137 N.E.2d 371 (1956)). Unlike the above-cited cases in which government action based on specific legislation was

challenged, here, there is no specific legislation that even grants the Commission authority to enforce section 2—160—030 independently without the filing of a complaint.

CAC additionally posits that the trial court erred by failing to apply the *bona fide* occupational qualification exemption (Rules and Regulations Governing the Chicago Human Rights Ordinance, the Chicago Fair Housing Ordinance, and the Chicago Commission on Human Relations Enabling Ordinance, Regulation 305.100 (1996)) and religious organization exemption (section 2—160—080). However, we deem it unnecessary to analyze and decide those issues in this appeal.

For the foregoing reasons, we vacate the Commission's order in its entirety. We reverse the decision of the trial court and remand this cause with directions that the Commission conduct further proceedings consistent with the views expressed herein.

Vacated; reversed and remanded with directions.

CAHILL, P.J., and McBRIDE, J., concur.