Wilkins, Douglas H., J.
After accepting the position of Food Service Director at the defendant, Fontbonne Academy (“Fontbonne”), the plaintiff, Matthew Barrett (“Barrett”) filled out a “new employee” form, listing his husband as his emergency contact. Fontbonne, a Catholic preparatoiy school, then rescinded the offer of employment, citing an expectation that its employees will model its values, including the Catholic Church’s opposition to same-sex marriage. Claiming employment discrimination on the basis of sexual orientation and gender, Barrett sued Fontbonne under G.L.c. 15 IB. Fontbonne denied the allegations and claimed statutory and constitutional exemptions from c. 151B, raising serious issues of first impression. The plaintiff has filed “Plaintiff Matthew Barrett’s Motion for Summary Judgment” (“Plaintiff’s Motion”). Fontbonne filed simultaneously “Fontbonne Academy’s Motion for Summary Judgment” (“Defendants’ Motion”). After hearing on December 1, 2015, the Defendants’ Motion is DENIED and Plaintiffs Motion is ALLOWED.
BACKGROUND
Fontbonne is an independently incorporated, Catholic, college-preparatory school for young women, located in Milton, Massachusetts. Fontbonne is a sponsored ministry of the Congregation of the Sisters of Saint Joseph of Boston. It describes its mission as “the education of young women rooted in gospel values and the teachings of the Catholic Church.” Fontbonne does not limit enrollment to members of the Catholic religion. Fontbonne’s administration, Theology faculty, and staff in the Office of Mission and Ministry are the only employees required to be members of the Catholic religion.
Barrett lives in Dorchester, Massachusetts. He has over twenty years of experience in the food services industry. On September 29, 2012, Barrett married his husband, Edward Suplee.
In June of 2013, Barrett applied for the job of Food Services Director at Fontbonne. At the time of his application, he knew that Fontbonne was a private Catholic school for girls. In June of 2013, Barrett had his first interview with Sister Maiyanne Enright. After the interview, Sister Enright arranged a meeting for Barrett and Karen Risso, the Fontbonne employee who would be Barrett’s cafeteria assistant. Barrett met with Risso during approximately the first week of July 2013.
On July 9, 2013, Barrett had a third interview with Sister Enright and Fontbonne’s Head of School, Mary Ellen Barnes (“Barnes”). Barnes was also the Chief Executive Officer of Fontbonne, and possessed the ultimate authority on hiring and firing employees. During the interview, Barnes told Barrett that every employee is regarded as a “minister of the mission.” Barnes also told Barrett that he would be expected to model Catholic teaching and values, and was asked if he could “buy into that.” Barrett responded affirmatively. On the same day, Barnes offered Barrett the position of Food Services Director and Barrett accepted the offer. Barrett filled out an employee new hire form in Barnes’ office in which he listed his “emergency contact” as “Ed Suplee,” who he indicated was related to him as his “husband.”
On July 11, 2013, Barrett received an email from Sister Enright stating that there was a problem with his employment and requesting him to return to the school. On July 12,2013, Barrett met with Barnes and Sister Enright. At the meeting, Barnes told Barrett that Fontbonne would not hire him because he was a spouse in a same-sex marriage, which was inconsistent with the teachings of the Catholic Church.
DISCUSSION
On summary judgment, the moving party has the burden to demonstrate that there is no genuine issue as to any material fact and that it is entitled to a judgment as a matter of law. Foley v. Boston Hous. Auth., 407 Mass. 640, 643 (1990). The movant may meet this burden by showing that the plaintiff has no reasonable expectation of producing evidence on a necessary element of his case. Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991). Once the moving party meets the burden, the opposing party must advance specific facts that establish a genuine dispute of material fact. Id.
I.
The undisputed facts establish the employer’s motivation with unparalleled clarity. Fontbonne declined to hire a qualified food service employee because he was a spouse in a same-sex marriage. That violated G.L.c. 151B, §4(1), which states: *289 It is no answer to say that Fontbonne denied Barrett employment because he was in a same-sex marriage, not because of his sexual orientation. The law recognizes no such distinction. “A tax on wearing yarmulkes is a tax on Jews.” Bray v. Alexandria Women’s Health Clinic, 506 U.S. 263, 270 (1993). “Likewise, discrimination on the basis of one’s opposition to same-sex marriage is discrimination on the basis of sexual orientation.” Mullins v. Masterpiece Cakeshop, Inc., 2015 COA 115, 2015 Colo.App. LEXIS 1217 at *21 (Ct.App.Div. 1, August 13, 2015). This principle simply follows the well-established refusal of the courts “to distinguish between status and conduct in [the sexual orientation discrimination] context.” Christian Legal Society v. Martinez, 561 U.S. 661, 689 (2010); see Lawrence v. Texas, 539 U.S. 558, 583 (2003) (O’Connor, J., concurring); cf. Attorney General v. Desilets, 418 Mass. 316, 320 (1994) (affirming a ruling on summary judgment that defendants were discriminating on the basis of marital status instead of conduct when they refused to rent to unmarried persons living together in a sexual relationship).
*288 It shall be an unlawful practice:
1. For an employer, by himself or his agent, because of the . . . sex .. . [or] sexual orientation ... of any individual to refuse to hire or employ or to bar or to discharge from employment such individual. [Emphasis added.]
*289 Fontbonne tries to justify its decision on the ground that hiring Barrett, while he was in a same-sex marriage, would be inconsistent with both the teachings of the Catholic Church and its own policy that all employees are models for the students. That may explain why Fontbonne denied Barrett employment “because of’ his sexual orientation. But the “because of’ language in §4(a) refers to the discriminatory reason itself, and does not contemplate an additional inquiry into why the employer intended to discriminate. A religious motivation has relevance, if at all, only in evaluating whether Fontbonne can claim the protection of a statutory or constitutional exemption from the anti-discrimination provisions of G.L.c. 151B, §4(1). Establishing or interpreting those exemptions is for the Legislature or the courts. It is not up to an employer—unless exempt—to choose employment discrimination as a means to accomplish its mission.[1]
Fontbonne also argues that there is an issue of fact regarding “the ultimate issue of discriminatory intent,” which should be submitted to a jury under the burden-shifting analysis recognized in many cases, including Blare v. Huskey Injection Molding Systems Boston, Inc., 419 Mass. 437, 439 (1995). There is no reason to employ burden-shifting analysis where there is direct evidence of discriminatory intent. See Chief Justice for Admin. & Mgt. of the Trial Court v. Mass. Comm’n Against Discrimination, 439 Mass. 729, 732 n.11 (2003). More fundamentally, Fontbonne’s discrimination “because of’ Barrett’s same-sex marriage is undisputed and, as shown above, amounts to discriminatory intent as a matter of law. There is nothing for a jury to decide on the intent question.[2]
On the undisputed facts, Barrett has shown that he is in a protected class, that he was qualified (and even received an offer) for the position of Food Service Director, that he suffered denial of employment, that the reason for denial was his sexual orientation and that he suffered harm as a result. This proves sexual orientation discrimination as a matter of law on the undisputed facts. See generally Sullivan v. Liberty Mutual Ins. Co., 444 Mass. 34, 39 (2005).
Given this conclusion, it may be unnecessary to determine whether the same undisputed facts also amount to gender discrimination. Nevertheless, it is clear that, because he is male, he suffered gender discrimination when he was denied employment for marrying a person-whom a female could have married without suffering the same consequences.
It follows that, unless Fontbonne has a defense, Barrett is entitled to judgment as to liability on Counts I and II. The question of damages cannot be resolved on the present record, particularly where the plaintiff seeks unliquidated emotional distress damages.
II.
Fontbonne asserts exemption from c. 151B[3] as an educational organization “operated, supervised or controlled by or in connection with a religious organization” under G.L.c. 151B, §4(18) (third paragraph), which provides:
Notwithstanding the provisions of any general or special law nothing herein shall be construed to bar any religious or denominational institution or organization, or any organization operated for charitable or educational purposes, which is operated, supervised or controlled by or in connection with a religious organization, from limiting admission to or giving preference to persons of the same religion or denomination or from taking any action with respect to matters of employment, discipline, faith, internal organization, or ecclesiastical rule, custom, or law which are calculated by such organization to promote the religious principles for which it is established or maintained. [Emphasis added.)
While this language appears in §4(18), which focuses upon housing discrimination, it contains the language “any action with respect to matters of employment.” To read it as applying only to housing and not to employment would make the bold language meaningless. For summary judgment purposes, at least, Fontbonne’s action was “calculated ... to promote the religious principles for which it is established or maintained.” Considered in isolation, then, the plain language of §4(18), coupled with the facts and inferences in defendant’s favor, appears to confer upon Fontbonne the exemption it claims in this case.
The problem is that the plain meaning of another provision of G.L.c. 151B, considered in isolation, compels exactly the opposite conclusion. In G.L.c. 151B, §1(5) (third sentence), the Legislature has defined “employer" to exclude only those religious organiza *290 tions that “limit[ ] membership, enrollment, admission, or participation to members of that religion”:
Notwithstanding the provisions of any general or special law nothing herein shall be construed to bar any religious or denominational institution or organization, or any organization operated for charitable or educational purposes, which is operated, supervised or controlled by or in connection with a religious organization, and which limits membership, enrollment, admission, or participation to members of that religion, from giving preference in hiring or employment to members of the same religion or from taking any action with respect to matters of employment, discipline, faith, internal organization, or ecclesiastical rule, custom, or law which are calculated by such organization to promote the religious principles for which it is established or maintained. [Emphasis added.]
Fontbonne is an “employer” under this section, because it does not limit membership, enrollment, admission or participation to Catholics. To hold otherwise would make meaningless the bold language (which is referred below to as the “limited membership clause”).
The court cannot apply either of the two quoted sections of c. 151B as written without, as noted above, making a portion of the other section meaningless. Rules of statutory construction prohibit interpretations that make statutory language meaningless. See Flemings v. Contributory Retirement Appeal Bd., 431 Mass. 374, 375-76 (2000) (“In interpreting statutes, none of the words of a statute is to be regarded as superfluous, but each is to be given its ordinary meaning without overemphasizing its effect upon the other terms appearing in the statute ... If a sensible construction is available, [the court] shall not construe a statute to make a nullity of pertinent provisions or to produce absurd results”). The court cannot read any of the conflicting words out of the statute. See Banushi v. Dorfman, 438 Mass. 242, 245 (2002). But in this case, there is no alternative that fully complies with those canons.
There is no clear way out of this dilemma. The principal rule is that “[i]n discerning a statute’s meaning, ‘[w]e interpret the words used in a statute with regard to both their literal meaning and the purpose and history of the statute within which they appear.’ ” Atlanticare Medical Center v. Commissioner of the Division of Medical Assistance, 439 Mass. 1, 6 (2003). The Court must also read each provision harmoniously with other language in the same statute to effectuate legislative intent. See Commonwealth v. Raposo, 453 Mass. 739, 745 (2009).
The best way to harmonize and preserve, as much as possible, the literal meanings of §1(5) and §4(18) is to read an implicit limitation into the latter provision, such that the phrase “any organization” refers, at least in the employment context, to organizations that meet the limited membership clause. That is not altogether satisfying, since “any” ordinarily implies no limitation. Barrett nevertheless urges that the Supreme Judicial Court adopted this approach in Collins when, in describing the law after St. 1989, c. 516, it said:
Under the c. 516 amendments, an organization operated for charitable or educational purposes would be entitled to an exemption under c. 15 IB for employment-related actions calculated to promote the religious principles for which it is established or maintained only if it is “operated, supervised, or controlled by or in connection with a religious organization” and it “limits membership, enrollment, admission or participation to'members of that religion.” Under the c. 516 amendments, such an organization’s employment-related actions will not be entitled to exemption if the organization is not “operated, supervised or controlled by or in connection with a religious organization” or if it does not “limit[ ] membership, enrollment, admission or participation to members of that religion.”
Collins v. Secretary of the Commonwealth, 407 Mass. 837, 843 (1990). These observations were not necessary to the Supreme Judicial Court’s holding in Collins that c. 516 was exempt from the Referendum provisions of the Massachusetts Constitution. This court is, of course, bound to follow the Supreme Judicial Court’s lead, even if the quoted statements are dicta. It is not clear, however, that the Supreme Judicial Court intended this passage to be applicable, let alone binding, on the facts here. The Collins decision (at id.) acknowledged that its description of the statute was “by no means complete” and, in the immediately preceding paragraph, described c. 516 in away that may conflict with the quoted passage—thus mirroring the contradiction in the statute itself.[4] Nor did the Court address the presence of the phrase “any action with respect to matters of employment” in G.L.c. 151B, §4(18). In case Collins leaves room for interpretation at the trial court level, further analysis moots any debate over the binding nature of the quoted passage, because this court reaches the same conclusion that the dicta imply.[5]
Since the words’ literal meanings lead to contradictory conclusions, the court reviews the statutory purpose first, followed by the legislative history. The court should construe the statute consistent with its “scheme and purpose.” Commonwealth v. Williamson, 462 Mass. 676, 683 (2012). It should read the statute “according to the intent of the Legislature ascertained from all its words construed by the ordinary and approved usage of the language, considered in connection with the cause of its enactment, the mischief or imperfection to be remedied and the main object to be accomplished, to the end that the purpose of its framers may be effectuated.” In Re Adoption of Marlene, 443 Mass. 494, 498 (2005), citing Telesetsky v. Wight, 395 Mass. 868, 872 (1985).
*291 The key enactment had two prominent purposes: (1) “making it unlawful to discriminate on the basis of sexual orientation” (St. 1989, c. 516 (title)), and (2) expanding the freedom of religious organizations from the anti-discrimination mandates of G.L.c. 15IB. See Collins, 407 Mass. at 852 (holding St. 1989, c. 516 exempt from the referendum as a “law that relates to religion, religious practices or religious institutions”). This is a particularly stark illustration of the general principle that:
“(N]o legislation pursues its purposes at all costs,” Rodriguez v. United States, 480 U.S. 522, 525-26 (1987) (per curiam), and “(e]very statute purposes, not only to achieve certain ends, but also to achieve them by particular means,” Director, Office of Workers’ Compensation Programs v. Newport News Shipbuilding & Dry Dock Co., 514 U.S. 122, 136 (1995).
Freeman v. Quicken Loans, Inc., 132 S.Ct. 2034, 2044 (2012).
Still, the title of c. 516—relied upon by two dissenting Supreme Judicial Court Justices in Collins—suggests that the two purposes do not have equal weight. Unlike the majority, the Collins dissenters reached the statutory purpose question and concluded that the “main thrust of’ the law ... is to bar discrimination based on sexual orientation." Id. at 852 (Nolan and Lynch, dissenting).[6] Resolving an otherwise irreconcilable linguistic conflict to bar discrimination based on sexual orientation would promote the stronger legislative purpose.
Other aspects of the legislative history also provide some support for that approach. The first version of G.L.c. 15 IB covered only employment discrimination. See St. 1946, c. 368 (“An Act Providing for a Fair Employment Practice law”). Its definition of “employer” in §1(5) exempted an “educational or religious association or corporation” if not organized “for private profit." In 1957, the Legislature added a separate provision in G.L.c. 15 IB, §4 prohibiting certain forms of housing discrimination and included an additional exemption for certain religious organizations. St. 1957, c. 426. It made no change in the definition of employer included in §1(5). That came in 1969. St. 1969, c. 216. That amendment deleted the words “religious association or corporation” and added the membership limitation clause to §1(5). It made no change to the religious exemption in §4. The Legislature thus has historically maintained two separate exemptions for religious and educational organizations, and consciously narrowed the exemption for an “employer” in 1969—an amendment that would have accomplished nothing if the §4 exemption still protected a broader class of religious and educational employers.
The amendment of both exemption provisions in 1989 proved the Legislature’s awareness of two distinct exemptions, as well as its intent to preserve those two separate provisions. St. 1989, c. 516, §§1, 14. As Collins noted, the 1989 amendments expanded protection for religious organizations. At the same time, the Legislature declined to remove the membership limitation clause from §1(5) even though the issue of increasing §l(5)’s religious protections was squarely before it. The Legislative history does not, of course, eliminate the challenges that arise from the linguistic inconsistencies in the two provisions, but it does confirm some legislative choices that are consistent with applying the membership limitation to employers who seek exemption from c. 15 IB.
Two additional principles of statutory construction favor the plaintiff. First, the courts usually construe narrowly any exceptions to remedial statutes addressing a broad public policy concern such as prohibition of employment discrimination. See Yi v. Sterling Collision Centers, Inc., 480 F.3d 505, 508 (7th Cir. 2007) (noting “the familiar principle of statutory interpretation that exemptions from a statute that creates remedies should be construed narrowly”). If “the principle of narrow interpretation of exemptions is a tie breaker” (id.), it helps to break the tie (or near-tie) in this case. That principle favors harmonizing §1(5) and §4(18) by construing the religious employer exemption narrowly. i.e., without vitiating the limited membership clause.
Second, in case of conflict, specific language controls over general language. See generally Doe v. Attorney General (No. 1), 425 Mass. 210, 215-16 (1997). Here, the dispute arises in the employment context. The specific language defining “employer” squarely applies. The limited membership clause implements the legislature’s intent to limit a religious employer’s authority to discriminate against employees unless the institution itself has adopted limited membership generally. Section 4(18) does not focus as specifically upon employment. As just noted, it rose when the legislature expanded c. 15IB beyond the original employment arena.
No rule of construction provides certainty here. They do, however, nearly all point in favor of the plaintiffs approach.
On the undisputed facts, Fontbonne cannot show that it “limits membership, enrollment, admission, or participation to members of that religion.” G.L.c. 15 IB, §1(5). With the exception of its administration and theology faculty, it does not require its employees to be Catholic. In particular, the Food Services Director does not have to be Catholic. Fontbonne has a policy of non-discrimination with respect to sexual orientation. Welcoming students of all faiths, its student body has included non-Catholics, including Muslims, Jews, Baptists, Buddhists, Hindus and Episcopalians.
It follows that Fontbonne, as employer, has no statutoiy exemption from the provisions of G.L.c. 15 IB that prohibit employment discrimination on the *292 basis of sexual orientation. Barrett is entitled to summary judgment on Fontbonne’s Sixth and Thirteenth Affirmative Defenses and any other defense claiming exemption pursuant to G.L.c. 15IB, §4(18).
III.
Fontbonne also asserts that its Constitutional right to expressive association entitles it to deny Barrett employment because it views his marriage to a man as incompatible with its mission and its expectations of its employees. This requires a three-part analysis. Boy Scouts of Am. v. Dale, 530 U.S. 640, 648 (2000); see Donaldson v. Farrakhan, 436 Mass. 94 (2002).
First, the Court must determine “whether the group engages in ‘expressive association.’ ” See Dale at 648. The “First Amendment’s protection of expressive association is not reserved for advocacy groups. But to come within its ambit, a group must engage in some form of expression, whether it be public or private.” Id. at 648. There is no doubt, and no dispute, that Fontbonne engages in at least some form of expression.
Second, the existence of any asserted contrary message must significantly and seriously burden expression. See Roberts v. United States Jaycees, 468 U.S. 609, 626 (1984) (assessing whether there are “serious burdens” on freedom of expressive association); N.Y. State Club Ass’n, Inc. v. City of New York, 487 U.S. 1, 13 (1988); Dale, 530 U.S. at 648 (“[t]he forced inclusion of an unwanted person in a group infringes the group’s freedom of expressive association if the presence of that person affects in a significant way the group’s ability to advocate public or private viewpoints”) (emphasis supplied); id. at 653 (standard is whether Dale’s presence would “significantly burden” the Scouts’ expression).
On the undisputed facts, Fontbonne cannot meet this test. Its mission is to provide an education to young women rooted in gospel values and the teachings of the Catholic Church. It encourages debate, including on issues of same-sex marriage, and does not prohibit students from exploring and even advocating ideas and positions contrary to church teachings. Barrett was hired as a Food Service Director, whose job duties do not include “formally presenting the gospel values or the . . . teachings of the Catholic Church.” Statement of Undisputed Facts ¶13. He was not denied employment for any advocacy of same-sex marriage or gay rights; he only listed his husband as an emergency contact on his “new hire” form. Nothing on that form suggested that Barrett claimed his marriage to have sacramental or other religious significance or that it was anything but a civil marriage relationship. Fontbonne presents no evidence of advocacy by Barrett.
That stands in contrast to Dale. There, the plaintiffs role as Boy Scout leader included instilling values in the scouts themselves. Barrett’s role would have been as Director of Food Services. That job does not include instruction, let alone any leadership role or responsibility for presenting the gospel values and teachings of the Catholic Church at Fontbonne. Moreover, the plaintiff in Dale himself advocated gay rights in advocacy groups, seminars and newspapers. Id. at 645, 653.[7] No evidence of advocacy is present here. Both of these distinctions were central to the holding in Dale that the Boy Scouts had a right to terminate the plaintiffs adult membership in the Boy Scouts. See id. at 655-56 (“The presence of an avowed homosexual and gay rights activist in an assistant scoutmaster’s uniform sends a distinctly different message from the presence of a heterosexual assistant scoutmaster who is on record as disagreeing with Boy Scouts policy”).
To be sure, Fontbonne maintains—as it told Barrett during the job interview—that all Fontbonne employees are expected to model Catholic values. That statement does not, by itself, demonstrate a significant and serious burden upon Fontbonne’s expression. To hold otherwise would swallow Dale’s second prong by permitting an employer to grant itself constitutional protection from anti-discrimination laws simply by saying the right words. Id. at 653 (“That is not to say that an expressive association can erect a shield against anti-discrimination laws simply by asserting that mere acceptance of a member from a particular group would impair its message”). See also Hsu v. Roslyn Union Free Sch. Dist. No. 3, 85 F.3d 839, 85 7858 (2d Cir. 1996); Chicago Area Council of BSA v. City of Chicago Comm’n on Human Rels., 322 Ill.App.3d 17, 28 (2001). Moreover, Fontbonne’s “model” requirement has at least enough flexibility to allow employment by those who adhere to and practice other religions and those who are in marriage between persons not baptized as Catholics. Fontbonne has a policy against discrimination on the basis of sexual orientation. It encourages debate by its students, including discussion of ideas that conflict with Catholic doctrine. As an educational institution, Fontbonne retains control over its mission and message. It is not forced to allow Barrett to dilute that message, where he will not be a teacher, minister or spokesperson for Fontbonne and has not engaged in public advocacy of same-sex marriage.
In this context, compliance with civil laws regulating employment relationships, over objection, does not significantly and seriously burden Fontbonne’s expressive association. There is clear distinction between (1) compliance with a non-discrimination mandate imposed by our civil laws even upon unwilling employers, and (2) actual acceptance of same-sex marriage as a matter of religious doctrine or public policy. Even for students and the public, the difference is not subtle. Understanding distinctions of that kind is at least consistent with the scope of critical inquiry that occurs within Fontbonne’s educational program, as described by its leaders. Fontbonne has every right, at its option, to articulate that distinction to students, parents and the public, and to require Barrett to refrain from contrary advocacy while employed. Par *293 ticularly if it chooses to do so, there is minimal risk of confusion.
The widespread public awareness of the civil laws allowing same-sex marriage and prohibiting employment discrimination, coupled with Fontbonne’s ability to explain its position without interference in the form of advocacy from Barrett, leaves little risk that Fontbonne’s involuntary compliance with civil law will be mistaken for endorsement of same-sex marriage. In these circumstances, requiring Fontbonne to retain a food service director who has done nothing more than list a same-sex husband as an emergency contact does not significantly and seriously burden Fontbonne’s expressive association.
Third, even if the inclusion of an unwanted member rises to the high level of a serious burden, “the freedom of expressive association, like many freedoms, is not absolute. [The Supreme Court has] held that the freedom could be overridden ‘by regulations adopted to serve compelling state interests, unrelated to the suppression of ideas, that cannot be achieved through means significantly less restrictive of associational freedoms.’ ” Dale, 530 U.S. at 648, quoting Roberts, 468 U.S. at 623.
The Commonwealth has a compelling interest in prohibiting discrimination against historically disadvantaged groups. See, e.g., Bob Jones Univ. v. United States, 461 U.S. 574, 604 (1983) (religiously-based ban on interracial dating); Roberts, 468 U.S. at 626 (exclusion of women from all-male civic organization). That interest is rarely stronger than in the employment context, notwithstanding religious objections. See Burwell v. Hobby Lobby Stores, Inc., 134 S.Ct. 2751, 2783 (2014) (rejecting “the possibility that discrimination in hiring, for example on the basis of race, might be cloaked as religious practice to escape legal sanction” because “(t]he Government has a compelling interest in providing equal opportunity to participate in the workforce without regard to race and prohibitions on racial discrimination are precisely tailored to achieve that critical goal”); Flagg v. Alimed, 466 Mass. 23, 28 (2013). The Commonwealth has recognized Constitutional protection for same-sex marriage for some time, and the federal constitution now extends similar protection as well. Goodridge v. Dept. of Public Health, 440 Mass. 309 (2003); Obergefell v. Hodges, 135 S.Ct. 2584 (2015). That demonstrates the strength of the Commonwealth’s interest in prohibiting discrimination here. That is all that Dale's third prong requires. Recognizing the Commonwealth’s compelling interest in no way suggests that Fontbonne agrees with the Commonwealth’s anti-discrimination policy, as long as it complies with the law imposed by the civil authorities upon employers generally, even under protest.[8] Fontbonne’s argument on this point depends upon a legally untenable distinction:[9]
Here the appropriate question is whether there is a compelling interest in eliminating discrimination by private, religious employers, against spouses to a same-sex marriage. Stating that there is a compelling interest in the elimination generally of employment discrimination, or the elimination generally of discrimination of the basis of sex or sexual orientation does not address the issue.
Deft’s Opp’n to Pl.’s Mot. for Summ. J. at 12. As noted above, discrimination against those in same-sex marriages is discrimination on the basis of sexual orientation. While the religious nature of the employer does bear upon other issues (including prong 2 of Dale), it does not lessen the impact of such discrimination or the interest in eliminating it.[10] The Commonwealth’s interest in eliminating sexual orientation discrimination in employment remains compelling.
On the undisputed facts, Fontbonne’s expressive association defense is ripe for summary judgment. Whether the undisputed facts of this case significantly affect associational rights, and whether any burden is outweighed by compelling state interests, are ultimately questions of law for the Court. Cf. Dale, 530 U.S. at 648-49 (“Because this is a First Amendment case where the ultimate conclusions of law are virtually inseparable from findings of fact, we are obligated to independently review the factual record to ensure that the state court’s judgment does not unlawfully intrude on free expression”)..
Requiring Fontbonne to refrain from discriminating in hiring a Food Services Director who, without more, reports on a “new hire” form that he is married to a husband does not significantly affect its associational rights and violates state anti-discrimination laws grounded in compelling state interests. Fontbonne’s expressive association rights provide no defense to the claims in this case.
IV.
Fontbonne also claims the protection of the Free Exercise Clause. It does not, and could not, claim that employing Barrett would in any way make it complicit in the same-sex marriage itself, contrary to its religious beliefs. Compare Desilets, 418 Mass. at 323. Rather, it claims entitlement to the “ministerial exception” recognized under the Free Exercise clauses of the state and federal constitutions. See Hosanna-Tabor Evangelical Lutheran Church & School v. EEOC, 132 S.Ct. 694, 706 (2012).
In Hosanna-Tabor, the Court found the employee to be a “minister” exempt from the provisions of employment discrimination law, based upon “the formal title given Perich by the Church, the substance reflected in that title, her own use of that tide, and the important religious functions she performed for the Church.” Id. at 708. It said: “the fact that an employee has been ordained or commissioned as a minister is surely relevant, as is the fact that significant religious training and a recognized religious mission underlie the description of the employee’s position.” Id. At issue *294 was “the interest of religious groups in choosing who will preach their beliefs, teach their faith, and carry out their mission.” Id.
Indisputably, none of these considerations apply to Barrett’s position as Director of Food Services. He has no duties as an administrator or teacher of religious matters. Fontbonne bases its case on this point exclusively upon its own statement that each of its employees is a “minister of the mission” to support its claim to this exemption. Assuming that Fontbonne meant this statement literally and not metaphorically, only Justice Thomas espoused the view that the ministerial exception applies whenever the religious organization “sincerely considered [the employee] a minister.” Hosanna-Tabor, 132 S.Ct. at 711 (Thomas, J., concurring) . That none of the other justices agreed with a view so clearly expressed to them strongly suggests that more is required. Indeed, to apply the “ministerial” exception here would allow all religious schools to exempt all of their employees from employment discrimination laws simply by calling their employees ministers. If that were the rule, most of the discussion in Hosanna-Tabor would have been unnecessary.
While Hosanna-Tabor did not “adopt a rigid formula for deciding when an employee qualifies as a minister” (id. at 708), the undisputed facts here do not permit a conclusion that Barrett was hired as a “minister” under any version of this doctrine considered by a majority of the United States Supreme Court. Indeed, the relatively narrow scope of the ministerial exception may shed light on the scope of expressive association rights regarding employees whose job does not include instruction. Cf. id., 132 S.Ct. at 706.
CONCLUSION
For the above reasons, the Court ORDERS AND ADJUDGES AS FOLLOWS:
1. Fontbonne Academy’s Motion for Summary Judgment is DENIED.
2. The Plaintiff Matthew Barrett’s Motion for Summary Judgment is ALLOWED AS TO LIABILITY ON COUNTS I AND II.
3. The Parties shall address whether this case needs to be scheduled for a trial on damages, which shall occur as soon as the court’s trial schedule permits.

 If it were otherwise, the limits that the legislature placed upon the religious exemption would easily be undone. An employer would simply argue that it acted for religious reasons, rather than discriminatory ones. As noted below, the courts have not accepted the view that assertion of religious motivation exempts an employer from the anti-discrimination laws.

 Indeed, since Barrett has advanced a prima facie case, Fontbonne cannot meet its burden of showing a nondiscriminatory reason for its decision and therefore would fail even burden-shifting analysis. Its only reason—that Barrett could not be a model—is premised on discrimination against him based upon his same-sex marriage, which is anything but non-discriminatory.

 This defense appears primarily in Fontbonne’s Sixth Affirmative Defense (“it acted on the basis of a bona fide occupational qualification”) and Thirteenth Affirmative Defense (“it was permitted to do so by the terms of M.G.L.ch. 151B”).

 The Court said: ‘The apparent effect of these amendments is that, where the action involved is calculated to promote the religious principles for which the organization is established or maintained, such religious and affiliated organizations are no longer subject to the provisions of c. 151B cited above relating to compensation; terms, conditions, or privileges of employment; retaliatory discharges; failure to provide information regarding arrests or convictions; maternity leave and sexual harassment.” Id. The court did not restrict this observation to religious organizations that met the membership limitation clause.

 Surprisingly, in the 25 years since enactment of St. 1989, c. 516, no appellate court has addressed the problem. Other authority—itself 23 years old—is sparse. See Piatti v. Jewish Community Centers of Greater Boston, Memorandum of Decision on Cross Motions for Summary Judgment No. 91-5198-D (March 4, 1992) (Izzo, J.) at 6 (“Clearly the Collins Court construes the two provisions (§1 and §4(18)), together, with the result being that Chapter 15 IB’s religious exemption is only open to organizations which limit membership”). The only MCAD decision brought to the Court’s attention is at the hearing officer level (not adopted by the Commission itself) and therefore is not entitled to deference as the agency’s interpretation of the statute it is charged to administer. See Larsen v. Sacred Hearts Parish School, 2000 WL 33665362 at *3 (MCAD, July 14, 2000) (“in legislating a religious exemption,” the Legislature “has abdicated its interest in regulating otherwise prohibited conduct under G.L.c. 15 IB where religious organizations take action based on religious doctrine”).

 The majority did not disagree; it did not engage in analysis of a “primary purpose, ” because it held the exclusion from the referendum process seeks to avoid public political debate about laws involving religion—mooting any question about a “primary” purpose. Id. at 849-50.

 The court stated that “here Dale, by his own admission, is one of a group of gay Scouts who have ‘become leaders in their community and are open and honest about their sexual orientation. ’ ” App .11. Dale was the co-president of a gay and lesbian organization at college and remains a gay rights activist. Dale’s presence in the Boy Scouts would, at the very least, force the organization to send a message, both to the youth members and the world, that the Boy Scouts accepts homosexual conduct as a legitimate form of behavior . . .''

 Fontbonne distorts the facts and issues when it claims (Deft.’s Opp. to Pl.’s Mot. for Summ. J. at 14) that, in this case, “the Commonwealth” asserts “a compelling interest in requiring a private religious school to adopt one or another civil definition of marriage.” Applying generally applicable employment discrimination law does not require Fontbonne to adopt any view of civil marriage, and so there is no occasion to weigh any such interest.

 Neither the existence of discrimination in the eyes of the law, nor the Commonwealth’s interest in extirpating it, varies depending upon the actor’s belief that it is not being discriminatory.

 Fontbonne’s distinction appears to mirror the analysis in Desilets, but that 1994 decision pre-dated the decision, six years later, in Dale. The policies addressed in Desilets are still relevant, but Dale breaks down the analysis into separate questions in a manner not employed by Desilets.