JOHN F. COLLINS & others[1] *vs*. SECRETARY OF THE
COMMONWEALTH & others.[2]

Suffolk. April 5, 1990. - July 5, 1990.

Present: LIACOS, C.J., WILKINS, ABRAMS, NOLAN, LYNCH, O'CONNOR, & GREANEY, JJ.

*Constitutional Law*, Referendum, Religion. *Referendum. Religion. Sexual Preference. Statute*, Amendment.

Discussion of the history of the provision in art. 48 of the Amendments to the Massachusetts Constitution, The Referendum, III, § 2, that "[n]o law that relates to religion, religious practices or religious institutions . . . shall be the subject of a referendum petition." [844-847]

Chapter 516 of the Acts of 1989, a statute that amended various sections of the General Laws in order to bar discrimination in housing, employment, public accommodation, and the granting of credit on the basis of sexual orientation and that, in addition, inserted provisions broadening the statutory exemptions previously accorded religious institutions and organizations from the anti-discrimination provisions of G. L. c. 151B, is a "law that relates to religion, religious practices or religious institutions," and thus may not be made the subject of a referendum petition under art. 48 of the Amendments to the Massachusetts Constitution. [847-852] NOLAN, J., with whom LYNCH, J., joined, dissenting.

CIVIL ACTION commenced in the Supreme Judicial Court for the county of Suffolk on January 5, 1990.

The case was reported by *Wilkins*, J.

*George E. Donovan* for the plaintiffs.

[1]Nine other qualified voters of the Commonwealth.

[2]Four State senators and six State representatives who were granted leave to intervene as defendants by a single justice while this case was pending in the county court.

We acknowledge the assistance of the amici briefs filed by the Massachusetts Teachers Association and the Massachusetts Lesbian & Gay Bar Association; Dignity/Boston, Inc.; Unitarian Universalists for Civil Rights; and Central Massachusetts Unitarian Universalists for Lesbian, Gay and Bisexual Concerns.

*Eric J. Mogilnicki*, Assistant Attorney General, for the Secretary of the Commonwealth.

*Gary D. Buseck* for the interveners.

*Sarah J. Gibson*, for Massachusetts Teachers Association, amicus curiae, submitted a brief.

*Robert L. Quinan, Jr., Karl W. Saur, & Maureen Bennett*, for Massachusetts Lesbian & Gay Bar Association & others, amici curiae, submitted a brief.

LIACOS, C.J. At issue is whether St. 1989, c. 516, entitled "An Act making it unlawful to discriminate on the basis of sexual orientation," may be the subject of a referendum under art. 48 of the Amendments to the Massachusetts Constitution, which excludes from the referendum process any "law that relates to religion, religious practices or religious institutions . . . ." We hold that the referendum is barred by art. 48.

Chapter 516 of the Acts of 1989 was signed by the Governor on November 15, 1989. The next day, ten qualified voters of the Commonwealth (plaintiffs) filed with the Secretary of the Commonwealth (Secretary) a petition for a referendum on c. 516. The Secretary asked the Attorney General for an opinion as to whether c. 516 could be the subject of a referendum petition. The Attorney General provided an opinion which concluded that c. 516 was a law that "relates to religion, religious practices or religious institutions" within the meaning of art. 48 and, thus, could not be the subject of a referendum petition. The Secretary then informed the petitioners that no blanks for use of subsequent signers of the petition would be released absent a court order.[3]

---

[3]Nevertheless, the Secretary requested, and the Attorney General supplied, a concise summary of c. 516. The Secretary arranged for a printer to typeset and print blank signature sheets for the use of petitioners in gathering subsequent signatures. After plaintiffs commenced this action, a single justice ordered the Secretary to supply blanks to the plaintiffs. In February, 1990, plaintiffs timely filed 61,382 certified signatures with the Secretary; the Secretary has determined that the petition has been signed by the number of qualified voters, properly distributed among counties, as required by art. 48.

In January, 1990, plaintiffs commenced this action in the Supreme Judicial Court for Suffolk County. Their complaint seeks a determination that c. 516 is subject to the referendum process and preliminary and permanent injunctive relief to enable it to appear on the State-wide ballot in November, 1990. The single justice reserved and reported the case without decision to the full court on the basis of the pleadings and the parties' statement of agreed facts.

*The statute.* Chapter 516 of the Acts of 1989 contains twenty sections. Section 18 provides: "It is hereby found and declared that the sexual orientation of a person is an invalid basis for discrimination in areas of housing, employment and the granting of credit." Fourteen sections of c. 516 amend various provisions of G. L. c. 151B, which generally bars discrimination in housing, employment, and the granting of credit on the basis of race, color, religious creed, national origin, sex, ancestry, age, or handicap. The effect of most of these amendments to G. L. c. 151B is to add the words "sexual orientation, which shall not include persons whose sexual orientation involves minor children as the sex object" to the list of bases as to which discrimination is not permitted.[4]

Two other sections of c. 516 add provisions to the public accommodations law, G. L. c. 272, § 92A and 98, similarly barring discrimination on the basis of sexual orientation. Sections 1 and 14 of c. 516 add new provisions to c. 151B dealing expressly with religion, religious practices, and religious institutions. It is these two sections of c. 516 which led the Attorney General to conclude that c. 516 could not be the subject of a referendum petition. We examine these sections in greater detail.

---

[4]Some of the subsections of G. L. c. 151B, § 4, which were amended by c. 516 were later struck by St. 1989, c. 722, §§ 13, 18, and 19, and replaced by new or additional subsections which continue to bar discrimination in housing or credit on the basis of sexual orientation.

Section 1 of c. 516 struck the last sentence of c. 151B, § 1(5) (definition of "employer"), set forth in the margin,[5] and inserted in its place the following:

> "*Notwithstanding the provisions of any general or special law* nothing herein shall be construed to bar any religious or denominational institution or organization, or any organization operated for charitable or educational purposes, which is operated, supervised or controlled by or in connection with a religious organization, and which limits membership, enrollment, admission, or participation to members of that religion, from giving preference in hiring or employment to members of the same religion *or from taking any action with respect to matters of employment, discipline, faith, internal organization, or ecclesiastical rule, custom, or law which are calculated by such organization to promote the religious principles for which it is established or maintained*" (new language emphasized).

Section 14 of c. 516 struck the third paragraph of G. L. c. 151B, § 4 (unlawful practices), set forth in the margin,[6] and inserted in its place the following paragraph:

---

[5]Subsection 5 of G. L. c. 151B, § 1, read as follows before amendment by St. 1989, c. 516:

"The term 'employer' does not include a club exclusively social, or a fraternal association or corporation, if such club, association or corporation is not organized for private profit, nor does it include any employer with fewer than six persons in his employ, but shall include the commonwealth and all political subdivisions, boards, departments and commissions thereof. Nothing herein shall be construed to bar any religious or denominational institution or organization, or any organization operated for charitable or educational purposes, which is operated, supervised or controlled by or in connection with a religious organization, and which limits membership, enrollment, admission, or participation to members of that religion, from giving preference in hiring or employment to members of the same religion."

[6]The third paragraph of G. L. c. 151B, § 4 (1988 ed.) read as follows before amendment by St. 1989, c. 516:

"*Notwithstanding the provisions of any general or special law* nothing herein shall be construed to bar any religious or denominational institution or organization, or any organization operated for charitable or educational purposes, which is operated, supervised or controlled by or in connection with a religious organization, from limiting admission to or giving preference to persons of the same religion or denomination or from *taking any action with respect to matters of employment, discipline, faith, internal organization, or ecclesiastical rule, custom, or law which are* calculated by such organization to promote the religious principles for which it is established or maintained" (new language emphasized).

These amendments represent a broadening of the statutory exemption previously accorded religious institutions and organizations, and certain affiliated charitable or educational organizations, from the anti-discrimination provisions of c. 151B. The exemptions they create are not limited to the new provisions of c. 151B barring discrimination on the basis of sexual orientation, but extend to provisions barring discrimination on the basis of race, color, religious creed, national origin, sex, ancestry, age, or handicap. Repeal of these exemptions by virtue of a referendum would reinstate the prior, more limited, statutory exemptions.

The nature of the statutory changes wrought by c. 516 can be illustrated by considering their apparent effect on regulation of matters of employment. Before amendment by c. 516,

"Nothing herein contained shall be construed to bar any religious or denominational institution or organization, or any organization operated for charitable or educational purposes, which is operated, supervised or controlled by or in connection with a religious organization, from limiting admission to or giving preference to persons of the same religion or denomination or from *making such selection as is* calculated by such organization to promote the religious principles for which it is established or maintained" (emphasis added). The emphasized language was deleted by c. 516 and replaced by new language.

the two provisions of c. 151B at issue exempted qualifying religious or affiliated organizations from provisions of c. 151B that otherwise would have barred such organizations from "giving preference in hiring or employment to members of the same religion," or "from limiting admission to or giving preference to persons of the same religion or denomination or from making such selection as is calculated by such organization to promote the religious principles for which it is established or maintained." The effect of these former provisions was to permit such organizations to discriminate on the basis of religious creed (at least between persons of the same religion as the religious organization, on the one hand, and all other persons, on the other) in admission, employment, and perhaps other activities involving some sort of "selection." On their face, however, those provisions did not exempt such organizations from provisions of c. 151B barring discrimination (at least among persons of the same religion and, separately, among all other persons) in compensation and other terms, conditions, or privileges of employment based on race, color, national origin, sex or ancestry (G. L. c. 151B, § 4[1]); age (c. 151B, § 4[1B], [3]); or handicap (G. L. c. 151B, § 4[3], [16]). Those former provisions of c. 151B also did not purport to exempt such organizations from G. L. c. 151B, § 4(4), barring retaliatory discharges or other discrimination against a person who has opposed a practice forbidden by c. 151B; nor did they exempt such organizations from much, if not all, of G. L. c. 151B, § 4(9), barring discrimination in matters of employment against a person for failure to provide information regarding certain prior arrests or convictions; nor did they exempt such organizations from G. L. c. 151B, § 4(11A), at least to the extent that that subsection subjects an employer to the sanctions of c. 151B where the employer fails to comply with the provisions of G. L. c. 149, § 105D (the taking of certain maternity leave shall not affect an employee's right to vacation time, sick leave, bonuses and other benefits, plans or programs for which she was eligible at the date of her leave). Nor did

those provisions exempt such organizations from G. L. c. 151B, § 16A (barring sexual harassment of employees).

By contrast, the amendments resulting from enactment of c. 516 exempt the same qualifying religious and affiliated organizations from provisions of c. 151B that would otherwise bar them "from taking *any action* with respect to matters of employment . . . which are calculated by such organization to promote the religious principles for which it is established or maintained" (emphasis added). The apparent effect of these amendments is that, where the action involved is calculated to promote the religious principles for which the organization is established or maintained, such religious and affiliated organizations are no longer subject to the provisions of c. 151B cited above relating to compensation; terms, conditions, or privileges of employment; retaliatory discharges; failure to provide information regarding arrests or convictions; maternity leave and sexual harassment.

Under the c. 516 amendments, an organization operated for charitable or educational purposes will be entitled to an exemption from c. 151B for employment-related actions calculated to promote the religious principles for which it is established or maintained only if it is "operated, supervised or controlled by or in connection with a religious organization" and it "limits membership, enrollment, admission or participation to members of that religion." Under the c. 516 amendments, such an organization's employment-related actions will not be entitled to exemption if the organization is not "operated, supervised or controlled by or in connection with a religious organization" or if it does not "limit[ ] membership, enrollment, admission or participation to members of that religion." Similarly, under the c. 516 amendments, no exemption from c. 151B is provided to other employers subject to c. 151B who take actions calculated to promote the employer's religious principles.

The point of this somewhat extended (but by no means complete) description is to make clear the nature and facial effect of two portions of the law which plaintiffs seek to put to the voters for a referendum. In gist, these provisions at-

tempt to draw lines demarcating the circumstances when certain otherwise prohibited employment-related actions will be exempt from regulation.[7]

*Discussion.* Article 48 provides that "Legislative power shall continue to be vested in the general court; but the people reserve to themselves . . . the referendum, which is the power of a specified number of voters to submit laws, enacted by the general court, to the people for their ratification or rejection." Article 48 further provides: "A referendum petition may ask for a referendum to the people upon any law enacted by the general court which is not herein expressly excluded." The article then provides: "Excluded Matters. - No law that relates to religion, religious practices or religious institutions; . . . or to the powers, creation or abolition of courts; . . . shall be the subject of a referendum petition."

In *Yont* v. *Secretary of the Commonwealth*, 275 Mass. 365, 366-367 (1931), the court stated: "An amendment to the Constitution is a solemn and important declaration of fundamental principles of government. It is characterized by terse statements of clear significance. Its words were employed in a plain meaning to express general ideas. It was written to be understood by the voters to whom it was submitted for approval. It is to be interpreted in the sense most obvious to the common intelligence. Its phrases are to be read and construed according to the familiar and approved usage of the language."

It is plain from the face of art. 48 that the Massachusetts Constitutional Convention of 1917-1918, and the people of the Commonwealth who adopted art. 48 in November, 1918, determined that "[s]ome matters are naturally unsuitable for popular lawmaking . . . for various reasons. The people for their own protection have provided that the initiative [and the referendum] shall not be employed with respect to certain matters. Unless the courts . . . enforce those exclusions,

---

[7]Another consequence of these amendments, analyzed in conjunction with other portions of c. 516, is that certain religious and affiliated organizations are now subject to the new substantive provisions of c. 516 barring various types of discriminatory actions on the basis of sexual orientation.

they would be futile, and the people [w]ould be harassed by measures [and laws] of a kind that they had solemnly declared they would not consider." *Bowe* v. *Secretary of the Commonwealth*, 320 Mass. 230, 247 (1946).

With respect to the religion exclusion in art. 48, the reasons underlying the determination that such matters ought not be submitted to the people for their consideration become apparent when the debates of the Constitutional Convention are examined. In *Yont* v. *Secretary of the Commonwealth, supra*, the court noted: "It is permissible to examine the debates of the Constitutional Convention for the purpose of ascertaining the views presented to the Convention and the understanding of its members, although the plain meaning of the words used in the Amendment cannot be thereby controlled." *Id.* at 369.

The debates of the Constitutional Convention confirm that, with respect to the provisions excluding measures and laws relating to religion, religious practices, or religious institutions from the initiative and referendum, the intent and understanding of the convention was to avoid the consequences of permitting State-wide public political discussion of matters relating to religion. For example, after offering an amendment which would insert such language into the section governing the initiative, Mr. Swig of Taunton expressed his purpose to "protect the initiative and referendum against the religious fanatics and against the professional religionists . . . [who] try to get political preferment because of their religious belief, and . . . to protect the initiative and referendum from the efforts that will be made . . . to drag constantly before the people these religious fights." 2 Debates in the Massachusetts Constitutional Convention of 1917-1918, 766-767 (1918). Mr. Curtis of Boston expressed the view "that all religious subjects would be handled better by considering them before the Legislature than . . . [by] making them the subject of a general discussion by the people at large." *Id.* at 768. Mr. Anderson of Newton stated his belief "in the entire separation of church and State, . . . that religion has no place in politics at all, . . .[and] that we ought to

make it as difficult as possible to bring religious questions into the politics of this State." *Id.* at 769.

Mr. Swig's amendment was carried by voice vote, *id.* at 770, and was later inserted into the provisions governing the referendum. See *id.* at 956. Thus, the harm sought to be addressed was *public political debate* concerning measures and laws relating to religion, religious practices, and religious institutions.[8] See Stewart, The Law of Initiative Referendum in Massachusetts, 12 New England L. Rev. 455, 478 (1977) ("The religion exclusion was intended . . . to limit the public electoral dialogue and lawmaking power to secular, political subjects rather than making the power a vehicle for public discussion of and intrusions into private religious affairs"). See also *Bloom* v. *School Comm. of Springfield*, 376 Mass. 35, 39 (1978) (noting that proponents of the Anti-Aid Amendment in the Constitutional Convention of 1917-1918 urged "that to promote civic harmony the irritating question of religion should be removed from politics as far as possible").

In only one instance have we directly considered the exclusion in art. 48 for a measure or law "that relates to religion, religious practices, or religious institutions." *Opinion of the Justices*, 309 Mass. 555 (1941). The Justices considered a measure that had been proposed providing that various criminal statutes barring the manufacture or dissemination of information regarding the availability of devices or drugs to prevent conception or pregnancy would not apply "to treatment or prescription given to married persons for protection of life or health by or under the direction of physicians . . .; nor to teaching in chartered medical schools; nor to publica-

---

[8]To further ensure that matters affecting religion would not be subject to public debate, the Convention inserted, and the people adopted, provisions that the then recently amended Anti-Aid Amendment (art. 18, as amended by art. 46 of the Amendments) could not be the subject of an initiative amendment, and that "[n]o part of the constitution specifically excluding any matter from the operation of the popular initiative and referendum shall be the subject of an initiative petition; nor shall this section be the subject of such a petition." Art. 48, The Initiative, II, § 2.

tion or sale of medical treatises or journals." *Id.* at 556. The
Legislature sought our opinion as to whether the measure re-
lated to religion, religious practices, or religious institutions
so as to be excluded from the initiative process. The Justices
observed that the "words in the Amendment are to be inter-
preted in the light of their context and of the Constitution
and its Amendments as a whole. . . . They 'are to be given
their natural and obvious sense according to common and ap-
proved usage.' " (Citation omitted.) *Id.* at 557. The Justices
opined the exclusionary provision "recognizes that there is a
field for the exercise of the legislative power of the people
which is secular rather than religious, and that a measure to
be excluded thereby from the initiative [or the referendum]
must relate distinctively 'to religion, religious practices or re-
ligious institutions.' " *Id.* at 558. The Justices noted: "The
proposed law is in the field of the police power for the promo-
tion and preservation of the public health . . . . According to
common understanding, this, in general, is a secular field. . . .
The proposed law makes no discrimination by reason of the
religious views of the persons within its scope. It neither com-
mands nor prohibits any form of religious belief or the teach-
ing thereof, or any form of religious worship or religious
practice. And it does not command or prohibit conduct on
the part of any person that in his 'views of his relations to his
Creator . . . and of obedience to his will' constitutes obedi-
ence or disobedience to the will of the Creator. . . . The pro-
posed law is purely permissive. Religion is not a factor in its
application and, if approved by the voters, it will not inter-
fere with the freedom of any person within its scope to act in
strict accordance with his religious views." *Id.* at 558-559.

It is clear that, measured against the standards articulated
in *Opinion of the Justices, supra,* c. 516 is a law "relates to
religion, religious practices or religious institutions" within
the meaning of art. 48. As the Attorney General observed in
his opinion to the Secretary, §§ 1 and 14 of c. 516 "alter the
legal status of religious institutions with respect to discrimi-
nation on the basis of such characteristics as race, sex, na-
tional origin, age, and handicap" and "directly provide for

special treatment of 'any religious or denominational institution or organization.' " In contrast to the measure considered in *Opinion of the Justices, supra,* these provisions of c. 516 "make an institution's connection with religion the sole factor in the application of the exemption, and make 'religious principles' the sole basis upon which [certain] discrimination is permitted." If c. 516 were to be repealed, "religious organizations would lose the benefit of the expanded exemption" from a variety of anti-discrimination prohibitions in c. 151B.

If c. 516 were made the subject of a referendum, voters would be called to consider whether the scope of freedom of religious institutions to discriminate should be expanded or constricted. As the Attorney General further observed, c. 516 "includes a broad 'preferment' of religious institutions to discriminate on the basis of race, color, religious creed, national origin, sex, age, ancestry, handicap and . . . sexual orientation in ways not permitted of any other persons or organizations. [If such a preferment] were made the subject of a referendum, the public would be permitted to vote directly on how religious institutions may conduct themselves." The Attorney General concluded that, in view of the considerations enunciated in *Opinion of the Justices, supra,* on its face, c. 516 is a "law that relates to religion, religious practices or religious institutions" within the meaning of the excluded matters provision of art. 48. We agree.

Before this court, the plaintiffs contend that c. 516 does not relate to religion, religious practices, or religious institutions because, they assert, it has no *effect* on religion, religious practices or religious institutions. This is because, the plaintiffs maintain, c. 516 exempts religious institutions from the anti-discrimination provisions of c. 151B only with respect to matters of theologically-based, internal self-governance. They claim that the statute merely has the effect of recognizing the preexisting constitutional right of religious institutions to be free from governmental interference in such matters of theologically-based, internal self-governance. In essence, plaintiffs propose a new test for evaluating whether a law falls within the religious matters exclusion of art. 48.

Alternatively, the plaintiffs argue that any relationship which c. 516 has to religion, religious practices or religious institutions is merely incidental to its main purpose — regulating discrimination on the basis of sexual orientation — and, therefore, it is not excluded from the referendum process.

In our view, the plaintiffs' arguments misperceive the evil prompting enactment of the exclusionary clause of art. 48. The "plain meaning" of the exclusionary words, "interpreted in the sense most obvious to common intelligence," and confirmed by examination of the debates at the Constitutional Convention, see *Yont* v. *Secretary of the Commonwealth,* 275 Mass. 365, 366-369 (1931), reveals a clear intent to prevent the initiative and referendum process from becoming a vehicle for public political debate, and enactment or rejection, of laws involving religion, religious practices, or religious institutions. This purpose would not be achieved, and the plain meaning of those words would be disregarded, were we to hold that a law which, like c. 516, on its face expressly purports to alter the rights and obligations of religious institutions, nevertheless may be made the subject of a referendum if the law's provisions, in light of the then-obtaining State and Federal constitutional jurisprudence, could be determined to have no practical effect upon such religious institutions. Even were this court able to determine, as matter of law, that plaintiffs' assessment of the effect of c. 516 is correct, such a determination by this court could by no means ensure that, if c. 516 were made the subject of a referendum, public discussion of c. 516 would not result in the very type of public political debate concerning matters of religion that the framers of art. 48 and the voters in 1918 sought to avoid. For example, public debate might be engendered over whether the statutory preferment for religious institutions should be ratified in order to guard against the eventuality that the State or Federal Constitution might be interpreted as not providing the scope of freedom to religious institutions as the statute accords. Such a debate necessarily would involve discussion of how religious and affiliated organizations ought to be allowed to conduct themselves.

In the past, we have noted that the inquiry whether a law is excluded from the initiative under art. 48 is a separate and distinct inquiry from whether it would be constitutional if enacted. See, e.g., *Opinion of the Justices*, 375 Mass. 795, 802 & n. 1 (1978). In *Bowe* v. *Secretary of the Commonwealth*, 320 Mass. 230, 243-247 (1946), we concluded that it would be inappropriate to pass on the constitutionality of a proposed law. Considerations similar to those discussed in *Bowe* counsel against attempting in the abstract to determine how the c. 516 exemptions might be construed in a hypothetical variety of cases and whether the result that would flow from such construction would be exactly equivalent to the result that would flow from application of State and Federal constitutional provisions affecting freedom of religion.[9]

We are of the view that a constitutional analysis of the law ought not be undertaken in this case in order to determine whether the law is excluded from the referendum.

---

[9]In *Bowe* we noted that courts do not decide constitutional questions unless it cannot be avoided, and that "in any case it would be difficult or even impossible to say abstractly and unconditionally that a statute is or is not constitutional." This observation is particularly pertinent with respect to constitutional questions regarding the rights of religious institutions, and of affiliated educational or charitable organizations, to discriminate, an area which is still, in large measure, unsettled. See, e.g., Underkuffler, "Discrimination" on the Basis of Religion: An Examination of Attempted Value Neutrality in Employment, 30 William and Mary L. Rev. 581, 596 n. 59 (1989) ("A problem, as yet unresolved, arises when discrimination on the basis of sex, race, color, or national origin is part of a religious organization's beliefs"); Laycock, Towards a General Theory of the Religion Clauses: The Case of Church Labor Relations and the Right to Church Autonomy, 81 Colum. L. Rev. 1373, 1395 (1981) ("The doctrinal details of [a church's] right to autonomy are in flux and not entirely clear"). Cf. *Employment Div. Dep't of Human Resources of Or.* v. *Smith*, 110 S. Ct. 1595, 1602-1603 (1990) (holding that the balancing test under which governmental actions that substantially burden a religious practice must be justified by a compelling governmental interest will no longer be applied to analyze free exercise challenges to across-the-board criminal prohibitions on a particular form of conduct) and *id.* at 1606 (O'Connor, J., concurring)("today's holding dramatically departs from well-settled First Amendment jurisprudence") and *id.* at 1616 (Blackmun, J., dissenting) (majority opinion "effectuates a wholesale overturning of settled law").

We think that the considerations set forth in *Opinion of the Justices*, 309 Mass. at 558-559, frame the appropriate inquiry most succinctly, viz.: whether, according to common understanding, the law in question "relate[s] distinctively 'to religion, religious practices or religious institutions,'" whether it "discriminat[es] by reason of the religious views of the persons within its scope" and whether "[r]eligion is . . . a factor in its application." Although it has been suggested that the *Opinion of the Justices*, 309 Mass. 555 (1941), "does not really delimit the religion exclusion [but merely] attempts to set some guidelines," Stewart, The Law of Initiative Referendum in Massachusetts, 12 New England L. Rev. 455, 480 (1977), we need attempt no further refinement of the applicable test in order to resolve this case. Under the plain meaning of art. 48, where a law "by its terms deals with religion, religious practices, or religious institutions, it is excluded." See *id.* at 481.[10]

---

[10]For their argument that a provision in a law ought not to exclude it from the referendum process if the law's main purpose is unrelated to an excluded matter and the law has only an incidental effect on the excluded matter, plaintiffs rely on cases dealing with the exclusion in art. 48 of laws "that relate[ ] . . . to the powers . . . of courts." *Opinion of the Justices*, 375 Mass. 795, 814-815 (1978). *Commonwealth* v. *Yee*, 361 Mass. 533, 537 (1972). *Cohen* v. *Attorney Gen.*, 354 Mass. 384, 387 (1968). *Horton* v. *Attorney Gen.*, 269 Mass. 503, 511 (1929). Because it is clear that c. 516's new exemption provisions are not merely incidental to the main purpose of c. 516, but can only be viewed as having a purpose and thrust largely independent of the provisions of c. 516 barring discrimination on the basis of sexual orientation, we need not resolve whether the "incidentality" test, or a variant thereof, has any application to the exclusion in art. 48 for laws that relate to religion, religious practices, or religious institutions.

In view of our conclusion that the Attorney General and Secretary of the Commonwealth correctly determined that c. 516 cannot be made the subject of a referendum petition by virtue of the exclusion in art. 48 of laws that relate to religion, religious practices, or religious institutions, we need not address the arguments raised by the defendant interveners that c. 516 may not be the subject of a referendum petition by virtue of other provisions of art. 48 excluding from the referendum any law that "relates to . . . the powers . . . of courts" or that is "inconsistent with" "the right of access to and protection in courts of justice" "as at present declared in the declaration of rights." Art. 48, The Initiative, II, § 2, and art. 48, The Referendum, III, § 2.

Finally, we note that our decision is based on the presence in c. 516 of provisions dealing expressly with religion, religious practices, or religious institutions. Although the presence of such provisions means that, under our Constitution, c. 516 may not be made subject to a referendum, our decision today does not mean that other provisions of c. 516 barring discrimination on the basis of sexual orientation are beyond the lawmaking power of the people as set forth in art. 48, The Initiative.

We remand this case to the county court for entry of a judgment declaring that St. 1989, c. 516, may not be made the subject of a referendum petition under art. 48 of the Amendments to the Massachusetts Constitution and otherwise dismissing the plaintiffs' complaint.

*So ordered.*


NOLAN, J. (dissenting, with whom Lynch, J., joins). This law is not about religion, religious practices, religious institutions, powers of the courts, or right of access to the courts. This law is about barring discrimination on the basis of sexual orientation. The Act, itself, is entitled "An Act making it unlawful to discriminate on the basis of sexual orientation." To assert that public debate surrounding this law will focus on anything other than this primary purpose is disingenuous. Clearly, the Legislature added §§ 1 and 14, not to benefit religious institutions, but to mitigate the risk of the statute being attacked on constitutional grounds. As such, §§ 1 and 14 are only incidentally related to the main thrust of the law, which is to bar discrimination based on sexual orientation. *Opinion of the Justices*, 375 Mass. 795, 814-815 (1978); *Commonwealth* v. *Yee*, 361 Mass. 533, 537 (1972); *Cohen* v. *Attorney Gen.*, 354 Mass. 384, 387 (1968); *Horton* v. *Attorney Gen.*, 269 Mass. 503, 511 (1929). In *Opinion of the Justices*, 309 Mass. 555, 558 (1941) this court concluded that a proposed law relating to contraception creating exemptions from criminal prosecution for certain individuals did not re-

late to religion but was rather a public health law. Similarly, c. 516, which bars various types of discriminatory actions on the basis of sexual orientation, is an anti-discrimination law and, as such, is unrelated to any matter excluded from the referendum process under art. 48. The law, therefore, is a proper subject for public debate. Therefore, I dissent.